# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGLERS CONSERVATION NETWORK, et al. | : |
| | : |
| Plaintiffs, | : |
| | : Civil Action No. 13-1761 (GK) |
| v. | : |
| | : |
| PENNY PRITZKER, et al., | : |
| | : |
| Defendants. | : |
| | : |

## MEMORANDUM OPINION

Plaintiffs, Anglers Conservation Network, Gateway Striper Club, Inc., Paul Eidman, and Philip Lofgren (collectively, "Plaintiffs"), bring this case against the Secretary of the Department of Commerce ("the Secretary"), the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS") (collectively, "Defendants") pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.

This matter is before the Court on Defendants' Motion to Dismiss [Dkt. No. 17]. Upon consideration of the Motion, Opposition [Dkt. No. 28], and Reply [Dkt. No. 29], and the entire record herein, including the arguments presented at the

Motion Hearing on September 30, 2014, and for the reasons set forth below, Defendants' Motion shall be **granted**.

I.  **BACKGROUND**

   A.  **The Magnuson-Stevens Act**

   Congress first enacted the MSA in 1976 "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States[.]"  16 U.S.C. § 1801(b)(1). The Act establishes a federal-regional framework "for the conservation and management of the fishery resources of the United States" in order to "prevent overfishing," "rebuild overfished stocks," "[e]nsure conservation," and "facilitate long-term protection of essential fish habitats."  Id. § 1801(a)(6); see also Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 749 (D.C. Cir. 2000).  Regulation of fisheries is accomplished through fishery management plans ("FMPs") that are developed and prepared by independent regional fishery management councils and approved, implemented and enforced by NMFS, a division within the Department of Commerce.[1]  See 16 U.S.C. §§ 1853-1854.

_____

[1] The Secretary of the Department of Commerce has delegated her responsibility to ensure compliance with the MSA to NOAA, which, in turn, has subdelegated that responsibility to NMFS.  Compl. ¶¶ 13-14; see also Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 101 (D.D.C. 2011).  At times, the Court shall refer to Defendants collectively as either "NMFS" or "the Secretary."

The MSA divides the United States into eight regions, each of which is represented by an independent fishery management council. See id. § 1852(a)(1). Councils are composed primarily of members who represent the interests of the states included in their region and who are appointed by the Secretary from a list of individuals submitted by the governor of each constituent state. Id. § 1852(b)(1), (2); see also C & W Fish Co. v. Fox, Jr., 931 F.2d 1556, 1557-58 (D.C. Cir. 1991). The remaining voting members of each council consist of the principal marine fishery management officials from each constituent state and the regional director of NMFS for the related geographic area. 16 U.S.C. § 1852(b)(1)(A), (B).

Each council is required to prepare and submit to the Secretary (acting through NMFS) a fishery management plan and any necessary amendments to such plan, "for each fishery under its authority that requires conservation and management[.]" Id. § 1852(h)(1). The term "fishery" is defined in the Act as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and [ ] any fishing for such stocks." Id. § 1802(13). A fishery management plan must describe the species of fish involved in the fishery and

specify the "conservation and management measures" that are "necessary and appropriate" to "prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery[.]" <u>Id.</u> § 1853(a)(1)(A), (2).

After a council prepares and approves a fishery management plan or amendment, it is sent to NMFS, which reviews it for consistency with the MSA and other applicable law and publishes it in the Federal Register for notice and comment. <u>Id.</u> § 1854(a)(1). After a 60-day notice and comment period, NMFS must "approve, disapprove, or partially approve a plan or amendment[,]" taking into account the views and comments of interested persons. <u>Id.</u> § 1854(a)(2),(3).

If NMFS approves a plan or amendment, or does not expressly disapprove it within 30 days, it becomes effective. <u>Id.</u> § 1854(a)(3). If NMFS disapproves or partially approves the plan or amendment, NMFS must thereafter notify the council of "the applicable law with which the plan or amendment is inconsistent"; the "nature of such inconsistencies"; and specific "actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." <u>Id.</u> § 1854(a)(3). The council "may" thereafter "submit a

revised plan or amendment to the Secretary for review[.]" Id. § 1854(a)(4).

With limited exceptions not relevant here, there are only two situations in which the Secretary is permitted to develop an FMP or amendment herself: (1) where, "after a reasonable period of time," the appropriate council has failed to make any recommendation regarding an FMP or necessary amendment; and (2) where the council has failed to submit a revised (or further revised) plan after the Secretary has disapproved or partially approved an FMP plan, amendment, or revision. Id. § 1854(c)(1)(A), (B). In these circumstances, the Secretary "may" promulgate a plan or amendment herself after inviting consideration and comment from the council and other interested parties and a 60-day notice and comment period. Id. § 1854(c)(1), (3), (4).

## B. Factual Background[2]

Plaintiffs are fishing organizations based in New York and New Jersey; the owner of an eco-tours and fishing business in Tinton Falls, New Jersey; and the "assistant herring warden" for

---

[2] The facts are taken from the Complaint ("Compl.") [Dkt. No. 1] and documents incorporated by reference in the Complaint. See, e.g., Wagener v. SBC Pension Benefit Plan-Non Bargained Program, 407 F.3d 395, 397 (D.C. Cir. 2005) (on a motion to dismiss, facts may be "taken from plaintiffs' complaint, as well as the exhibits attached to, and the documents incorporated by reference in, that complaint").

the Town of Weymouth, Massachusetts.  Compl. ¶¶ 8-11.  Their
Complaint pertains to the Atlantic Mackerel, Squid and
Butterfish fishery ("MSB" or "mackerel" fishery), which is
managed by the Mid-Atlantic Fishery Management Council ("Mid-
Atlantic Council" or "Council").  The Mid-Atlantic Council
represents the states of New York, New Jersey, Delaware,
Pennsylvania, Maryland, Virginia, and North Carolina.  16 U.S.C.
§ 1852(a)(1)(B).

### 1. The MSB Fishery

The MSB fishery is "a directed fishery dominated by
midwater trawl vessels," which catch fish by "dragging large
nets behind their vessels."  Compl. ¶ 57.  These nets snare
large numbers of other fish and marine wildlife at the same time
as they catch their target fish.  Of particular concern to
Plaintiffs are four species of fish, which shall be referred to
simply as the "river herring" and "shad," which are often caught
incidentally with Atlantic mackerel.[3]  River herring and shad
provide essential forage for large fish, marine mammals, and sea
birds, including striped bass, weakfish, blue fish, blue fish

---

[3] The four species at issue are: (1) blueback herring (Alosa
aestivalis), (2) alewife (Alosa pseudoharengus), (3) American
shad (Alosa sapidissima), and (4) hickory shad (Alosa
mediocris).  Compl. ¶ 47 & n.1.

tuna, marlin, sharks, ospreys, loons, herons, bald eagles, egrets, whales, and river otters. Compl. ¶ 47.

The FMP for the mackerel fishery, which was promulgated in 1983, recommends conservation and management measures for the Atlantic mackerel, longfin squid, Illex squid, and butterfish. Compl. ¶ 56. It does not, however, currently include any protections for the river herring and the shad because they are not designated as "stocks" in the MSB fishery.[4]

Plaintiffs allege that the incidental catch of river herring and shad by trawls in the MSB fishery "contributes significantly" to the total known mortality of these species. Id. ¶ 59. They allege that "river herring and shad populations have declined to historic lows in recent decades as a result of overfishing, habitat loss, and other factors." Compl. ¶ 48. They claim, for example, that 23 out of 24 stocks of river herring are "depleted" and that stocks of shad are "at all-time lows and [do] not appear to be recovering to sustainable levels." Id. ¶ 49.

## 2. Amendment 14 to the MSB Plan

The Mid-Atlantic Council is aware of the depleted state of the river herring and shad in federal waters. In 2010, it began

---

[4] The term "stock of fish" is defined under the MSA as "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C. § 1802(42).

development of Amendment 14 to the MSB plan, with one of the stated purposes being to "consider [measures] that would bring [the river herring and shad] into the . . . plan as a managed stock[.]" Compl. ¶ 70. Plaintiffs allege that, "at the last minute," NMFS advised the Council that its analysis of Amendment 14 was insufficient to add river herring and shad to the MSB fishery as managed stocks and "recommended initiation of a new amendment to fully analyze the issue." Id. ¶ 72.

In response, the Council decided not to add the river herring and shad to the FMP by way of Amendment 14 and opted instead "to develop a separate amendment, Amendment 15 to the MSB FMP, that would fully analyze the necessity of managing these stocks under the Magnuson-Stevens Act, the interjurisdictional issues related to management of these stocks, as well as the required and discretionary FMP provisions that would apply to these stocks if added to the fishery." Id. ¶ 73 (citing Amendment 14 FEIS, at 111).[5]

### 3. Amendment 15 to the MSB Plan

In the fall of 2012, the Council released a Draft Scoping Document and Action Plan for Amendment 15 and announced its intent to prepare an environmental impact statement regarding

---

[5] On February 24, 2014, NMFS published a final rule for Amendment 14 to the MSB FMP; however, that Amendment is not at issue in this case.

the proposed Amendment. Id. ¶¶ 75, 76. The Council also formed several technical committees and a fishery management action team ("FMAT") to consider direct management of the river herring and shad in the MSB fishery. Id. ¶ 76.

In June of 2013, the NMFS's Regional Administrator for the Mid-Atlantic Region, John Bullard, who is also a voting member of the Mid-Atlantic Council, sent a Guidance Memorandum to the Executive Director of the Council, Dr. Christopher Moore, "outlining how to make the determination whether or not to include river herring and shad as stocks to be managed in the MSB fishery[.]" Id. ¶ 77; see also Ex. 3 to Pls.' Opp'n (Mem. from Regional Administrator Bullard to Dr. Moore, dated June 6, 2013) ("Bullard's Guidance Memorandum") [Dkt. No. 28-4]. Plaintiffs claim that this Memorandum was flawed because it "did not recommend reliance on the statutory process outlined in the Magnuson-Stevens Act" or the "statutory definition of 'conservation and management.'" Compl. ¶ 77.

In response to Bullard's Guidance Memorandum, the Council prepared a white paper analyzing whether "additional management" of the river herring and shad was required. Compl. ¶¶ 78-79; see also Ex. 5 to Pls.' Opp'n (Mem. from Jason Didden to the Mackerel, Squid, and Butterfish (MSB) Committee/Council, dated September 30, 2013) ("White Paper") [Dkt. No. 28-6]. Plaintiffs

contend that this White Paper "strongly suggest[ed]" that the decision whether to add the river herring and shad to the MSB plan should be based on certain "National Standards" prepared by NMFS and "their (non-binding) guidelines," which Plaintiffs contend "unlawfully introduce[d] a 'cost-benefit' analysis into the decision[.]" Compl. ¶ 79.

On October 8, 2013, the Council met to consider Amendment 15. Id. ¶ 81. Although "37,000 comments were received in favor of adding river herring and shad to the MSB FMP, and only one (1) comment opposed it[,]" the Council voted, in a 9 to 10 vote, against a motion to move forward with the continued development of Amendment 15. Id. ¶¶ 81, 83.[6] Plaintiffs allege that "NMFS Regional Administrator Bullard cast the deciding vote to terminate Amendment 15," and "advocated strongly against adding river herring and shad to the MSB FMP[.]" Id. ¶¶ 82, 84.

After declining to proceed with immediate development of Amendment 15, the Council decided to revisit the issue of the river herring and shad in three years and, in the interim,

---

[6] Some confusion was raised at the Motion Hearing as to whether the Council's vote formally terminated further consideration of Amendment 15, as Plaintiffs argued, or simply postponed it, as the Government argued. Because this is a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court accepts Plaintiffs' characterization of the October 8, 2013, vote as true.

approved the creation of an "ad hoc interagency working group" to study the issue. Id. ¶¶ 85, 86.

## C. Procedural Background

On November 7, 2013, one month after the Council's vote of October 8, 2013, Plaintiffs filed this case challenging what they referred to as "NMFS's decision to terminate Amendment 15 and to not include river herring and shad as stocks in the mackerel fishery[.]" Compl. ¶ 101.

On January 24, 2014, Defendants filed the instant Motion to Dismiss, arguing that the Complaint fails to state a claim because the decision not to proceed with Amendment 15 was taken by the Mid-Atlantic Council, which is "not an agency of the federal government for purposes of the APA, [or] a division of the Department of Commerce[.]" Defs.' Mot. to Dismiss at 1 [Dkt. No. 17].

Plaintiffs did not immediately respond to Defendants' Motion to Dismiss. Instead, on March 26, 2014, they filed a new case based on Defendants' publication of a final rule for Amendment 14 to the MSB plan. See generally Anglers Conservation Network v. Pritzker, No. 14-509 (GK) (D.D.C. Mar. 26, 2014). The same day, they filed a Motion to Supplement their Complaint in this case to add allegations related to

-11-

Amendment 14 and to stay briefing on the instant Motion until Defendants responded to the proposed supplemental claims.

On April 28, 2014, the Court denied Plaintiffs' Motion to Supplement, observing that the original and supplemental claims "challenge two discrete decisions taken by two different decision-makers and involve two separate administrative records, each of which must be compiled and evaluated separately." Mem. Order of April 28, 2014, at 4 [Dkt. No. 27].[7] The Court did, however, grant Plaintiffs' request for an extension of time to file their Opposition to the instant Motion.

Thereafter, in accordance with the Court's Order of April 28, 2014, on June 2, 2014, Plaintiffs filed their Opposition to the Defendants' Motion to Dismiss [Dkt. No. 28], and on June 16, 2014, Defendants filed their Reply [Dkt. No. 29].

## II.  LEGAL STANDARD

To survive a motion to dismiss brought under Rule 12(b)(6), a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face" and to "nudge[ ] [the plaintiff's] claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

---

[7] Plaintiffs' lawsuit challenging Amendment 14 is proceeding as a separate case, also before this Court. See Anglers Conserv. Network v. Pritzker, No. 14-509 (GK) (D.D.C. Mar. 26, 2014).

In applying this standard, the court "must assume all the allegations in the complaint are true (even if doubtful in fact)" and give the plaintiff "the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks and citations omitted). The court does not, however, accept as true "legal conclusions or inferences that are unsupported by the facts alleged." Ralls Corp. v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 315 (D.C. Cir. 2014) (citation omitted). Furthermore, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

## III. ANALYSIS

As set forth above, the MSA establishes a carefully calibrated scheme under which the Secretary reviews the work of the regional councils, and her decision is appealable to the courts. Plaintiffs seek to circumvent this framework by asking the Court to review an intermediate decision of the Mid-Atlantic Council, which was never presented to the Secretary for review, has not been published for notice and comment, and was never formally approved or disapproved by the Secretary. Because

-13-

neither the MSA, nor the APA, nor NEPA provide any authority for this request, the Motion to Dismiss must be **granted**.

### A.    Count 1: Violation of the MSA

In Count 1, Plaintiffs challenge, under both the MSA and the APA, what they refer to as "NMFS's decision to terminate Amendment 15 and to not include river herring and shad as stocks in the mackerel fishery[.]" Compl. ¶ 101.

#### 1.    There Is no Basis for Judicial Review under the MSA

Plaintiffs first contend that their claim in Count 1 is directly reviewable under the MSA, which provides for judicial review of "actions that are taken by the Secretary under regulations which implement a fishery management plan" so long as the "petition for such review is filed within 30 days after . . . the action is published in the Federal Register[.]"   16 U.S.C. § 1855(f)(1)-(2).[8]

The lengthy and detailed factual allegations in the Complaint make abundantly clear that the decision to postpone any further development of Amendment 15 was not an "action . . . taken by the Secretary" within the meaning of Section 1855(f),

---

[8]   The MSA also permits judicial review of "[r]egulations promulgated by the Secretary under this chapter," 16 U.S.C. § 1885(f)(1), but Plaintiffs do not claim to challenge any such regulations. See Pls.' Opp'n at 24.

but a non-final decision of the independent Mid-Atlantic Council. Plaintiffs do not purport to challenge the Council's decision, and concede they purposefully did not name it as a defendant in this case. Pls.' Opp'n at 26. In fact, Plaintiffs acknowledge that "the Council itself has no power" to create legally binding rules or obligations. Id. at 27.

The Secretary, who does have the power to take legally binding action and whose sole actions are reviewable under Section 1855(f), never had occasion to act on Amendment 15 because it was never approved "by majority vote of the voting members" of the Council or "transmit[ted] by the Council to [her]." 16 U.S.C. §§ 1852(e)(1), 1854(a)(1).

Plaintiffs do not allege otherwise. They suggest, instead, that Regional Administrator John Bullard's June 2013 provision of guidance and advice to the Council regarding Amendment 15 and participation in the October 8, 2013, vote either themselves constituted "actions . . . taken by the Secretary" or transformed the decision of the Council into an action of the Secretary.

This theory is not consistent with the entire structure of the MSA. The MSA encourages and requires collaboration and information-sharing between the councils and NMFS (including by requiring a NMFS Regional Administrator, such as Bullard, to sit

-15-

on each council). See 16 U.S.C. §§ 1852(b)(1)(B), (c)(1)(A)-(D), (e)(4), (f)(2), (f)(5), (g)(1)(C), (h)(2), h(4). Nevertheless, it clearly establishes separate decisionmaking roles for councils and the Secretary and, importantly, only authorizes judicial review over "actions . . . taken by the Secretary." 16 U.S.C. § 1855(f) (emphasis added). Therefore, the mere fact that Bullard fulfilled his statutory duty by participating in the development and consideration of Amendment 15 clearly cannot transform a vote of the independent Council into one "taken by the Secretary."

This conclusion is reinforced by the fact that Section 1855(f) directly authorizes judicial review of only secretarial "actions" that are "published in the Federal Register" (emphasis added). 16 U.S.C. § 1855(f)(1). Amendment 15 was never published in the Federal Register, nor could it have been having never been approved by the Council.[9]

---

[9] The Court also notes that although Plaintiffs now argue, in an apparent attempt to fit their allegations into the limited scope of Section 1855(f), that Bullard's actions were taken "under" 50 C.F.R. § 648.1, that regulation section is merely an introductory provision explaining that Chapter VI, Part 648 of Title 50 "implements the fishery management plans (FMPs) for the Atlantic mackerel, squid, and butterfish fisheries" and other fisheries in the Northeastern United States. It contains no substantive content whatsoever and does not purport to authorize or support any specific action of Bullard or the Secretary pertaining to the MSB plan.

Finally, to the extent Plaintiffs rely on the MSA to challenge NMFS's independent failure to add the river herring and shad to the MSB plan, see Pls.' Opp'n at 26, this Court has previously held that "the clear text of the MSA" fails to provide any authority for judicial review of such "'inaction.'" Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv., 730 F. Supp. 2d 157, 172 (D.D.C. 2010). Consequently, Plaintiffs' "inaction" theory also fails to state a claim under the MSA.[10]

For these reasons, Plaintiffs have not stated a claim directly under the MSA.

## 2. There is No Basis for Judicial Review under the APA

Lacking a basis for judicial review under the MSA, Plaintiffs also seek judicial review under the APA. Courts have recognized that the APA provides an alternative basis for

[10] Plaintiffs cite Guindon v. Pritzker, No. 13-988, 2014 WL 1274076 (D.D.C. Mar. 26, 2014) as support for their argument that the MSA specifically authorizes judicial review of the Secretary's "unlawful failure to act." Pls.' Opp'n at 31-32. What the court held in Guindon, however, was that the MSA's limited judicial review provision did not preclude it from considering the Secretary's alleged failure to act under 5 U.S.C. § 706(1) of the APA. Guindon, 2014 WL 1274076, at *16-17. Defendants agree, as does the Court, that such review is available under the APA (even though it is not specifically available under the MSA). Plaintiffs' "inaction" theory shall therefore be considered in more detail in the context of their claim for review under the APA.

judicial review of the Secretary's actions that exists in addition to Section 1855(f). See, e.g., Guindon, 2014 WL 1274076, at *16-17 (applying the APA to claims under the MSA); Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv., No. 01-765, 2002 WL 732363, at *4 (D.D.C. Apr. 25, 2002) (same).

The APA, however, limits judicial review to "final agency action[s] for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. "A final agency action is one that marks the consummation of the agency's decisionmaking process and that establishes rights and obligations or creates binding legal consequences." Nat'l Res. Def. Council v. EPA, 559 F.3d 561, 564 (D.C. Cir. 2009) (citing DRG Funding Corp. v. Sec'y of Hous. & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996)); see also Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

An action by the Mid-Atlantic Council does not qualify as an "agency action" under the APA because, as Plaintiffs appear to concede, Pls.' Opp'n at 26-27, a fishery management council is "not itself an 'agency'" subject to judicial review. Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce, 635 F.3d 106, 112 n.15 (3d Cir. 2011) (citation omitted); see also (J.H. Miles & Co. v. Brown, 910 F. Supp. 1138, 1159 (E.D. Va. 1995) (holding that the Mid-Atlantic Council is not an "agency within the meaning of the [APA] . . . because it has no

-18-

'authority' to do anything"); <u>Gulf Restoration Network, Inc.,</u>
730 F. Supp. 2d at 172-74 (council's passage of FMP was not
final agency action because FMP had no legal effect until
promulgation of Secretary's implementing regulations).[11]

Plaintiffs advance several theories as to how the events
surrounding the development of Amendment 15 nevertheless
constitute "final agency action" reviewable under the APA.
None, however, are persuasive.

### a.   Federal Involvement in the Development of Amendment 15

First, Plaintiffs again argue that the involvement of
Regional Administrator Bullard and other federal employees in
the development of Amendment 15 transformed the Council's
consideration of the Amendment into an action by the Secretary.
As discussed earlier, however, the MSA specifically contemplates
and requires the collaboration of federal employees and regional

---

[11] Although Plaintiffs concede that the Council has no power to
pass binding rules or regulations, Pls. Opp'n at 27, they argue
that councils "have been treated as federal agency for certain
purposes." Pls.' Opp'n at 39. Plaintiffs do not specify which
"purposes" they refer to, and the sole case on which they rely
noted only that a regional council was "not a party to this
litigation" and therefore declined to reach the question of
whether it could be considered an "applicant" under the
Endangered Species Act. See <u>Hawaii Longline Ass'n</u>, 281 F. Supp.
2d at 21 n.30.   <u>Hawaii Longline Ass'n</u> did not hold or even
imply that regional councils are federal authorities for
purposes of any statute relevant to this case, nor has the Court
found any such case.

councils in developing conservation and management measures; the mere fact of such collaboration, therefore, cannot transform the Council's actions into final "agency action" under the APA.

Moreover, Bullard's Guidance Memorandum to the Council Staff, which Plaintiffs have incorporated by reference in their Complaint, merely sets forth his opinion as to the required legal framework for deciding whether to move forward with Amendment 15. See Ex. 3 to Pls.' Opp'n (Bullard's Guidance Memorandum) at 1-3 [Dkt. No. 28-4]. That guidance, influential as it may have been, certainly did not constitute the "consummation" of NMFS's decisionmaking process on Amendment 15 (no such Amendment having yet been approved by the Council or submitted to NMFS for review).

Nor was it a decision from which "rights or obligations" were determined or "legal consequences" flowed. See Bennett, 520 U.S. at 178 (noting that "tentative recommendation[s]" and recommendations that are "purely advisory" do not constitute "final" actions for purposes of the APA); Sprint Nextel Corp. v. F.C.C., 508 F.3d 1129, 1132 (D.C. Cir. 2007) (holding that statements of individual commissioners are not "institutional Commission actions" because they "do not represent the Commission's views"). Thus, Regional Administrator Bullard's Guidance Memorandum in June 2013 was not a final agency action.

Plaintiffs also appear to rely on NMFS's guidance to the Council regarding Amendment 14 and the fact that NMFS and NOAA employees served on the fishery management action team (FMAT) for Amendment 15. See Pls.' Opp'n at 16-20. As with the guidance provided by Bullard, however, the mere fact that NMFS and NOAA employees played an advisory role in the development of Amendments 14 and 15 does not transform the Council's actions on Amendment 15 into a final action of the Secretary. To the contrary, Section 1852(g) expressly requires councils to establish committees and advisory panels composed of "Federal employees, State employees, academicians, or independent experts," but states that any "[d]ecisions and recommendations made by [such] committees and panels . . . shall be considered to be advisory in nature." 16 U.S.C. § 1852(g)(5) (emphasis added).

Therefore, neither Bullard's guidance memorandum nor the collaboration and feedback between federal employees and the Council in developing Amendments 14 and 15 constitute "final" action of the Secretary subject to judicial review under the APA.

### b. Bullard's Participation in the October 8, 2013 Vote

Next, Plaintiffs suggest that Bullard's participation in the Council's October 8, 2013, vote was either itself a final action of the Secretary, or transformed the Council's vote into a final action of the Secretary. Pls.' Opp'n at 29-30. The Complaint is clear, however, that Bullard participated in that vote in accordance with his statutory role as a voting member of the Council, not as a final decision-maker of NMFS. See Compl. ¶ 84; see also 16 U.S.C. § (b)(1)(B) (voting members of each Council shall include "[t]he regional director of the National Marine Fisheries Service for the geographic area concerned").

Moreover, Bullard's vote was simply one of nineteen equally weighted Council member votes regarding further development of Amendment 15. Taken by itself, it had no conclusive effect and, therefore, cannot even be characterized as an "action" of the Council, much less one of the Secretary. See Sprint Nextel Corp., 508 F.3d at 1131-32 (holding that "votes were actions of the individual Commissioners, not the Commission" and citing the "'almost universally accepted common-law rule' that only a 'majority of a collective body is empowered to act for the body'") (citations omitted).

-22-

Plaintiffs make much of the fact that, in an October 28, 2013, email to NOAA official Daniel Morris, Bullard characterized his vote at the October 8 meeting as the "deciding vote" on Amendment 15. See Pls.' Opp'n at 30, 31, 34, 36, 38. They do not, however, allege that there was anything special about his vote as a Regional Administrator of NMFS that set it apart from the other nine votes cast against the continued development of Amendment 15. Furthermore, although they question Bullard's authority to be present at the October 8 meeting because it occurred during a Government furlough, they fail to cite any authority to support their suggestion that Bullard's participation in the Council's vote constituted final agency action simply because Bullard arguably lacked the authority to appear at the meeting.[12]

In sum, Regional Administrator Bullard's participation in the October 8, 2013, vote also did not constitute final agency action under the APA.

---

[12] Any such lack of authority (as to which this Court expresses no opinion) would, at best, merely call into question the validity of the final vote; it would not transform the Council's vote into a final agency action of the Secretary, as Plaintiffs suggest. See Pls.' Opp'n at 29 and n.19.

### c. NMFS's Failure to Add the River Herring and Shad to the MSB FMP

Third, Plaintiffs argue that NMFS had a "mandatory duty" under the MSA to establish conservation and management measures for the river herring and shad, which it failed to fulfill, thereby giving rise to what they assert is a cognizable claim under 5 U.S.C. § 706(1). See, e.g., Pls.' Opp'n at 25-28.

It should be noted that Plaintiffs' Complaint focuses entirely on the Council's activities in developing and considering Amendments 14 and 15, and the affirmative involvement in those activities of various NMFS officials. It nowhere alleges any independent failure by NMFS to take action to protect the river herring and shad. Nor does it include any factual allegations that would support consideration of such a theory, such as the length of time the river herring and shad stocks have been declining, the results of scientific studies suggesting such declines are directly attributable to fishing in the MSB fishery, and/or any efforts of NMFS and NOAA to address the issue to date and why those efforts are inadequate under the MSA.

Even if, however, the Complaint could be read to challenge NMFS's inaction under 5 U.S.C. § 706(1), Plaintiffs still have

not identified any such inaction that would qualify for judicial review.

Section 706(1) authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Supreme Court has clearly warned, however, that an agency's failures to act are only "sometimes remediable under [Section 706(1)], but not always." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61 (2004). More specifically, such a claim is cognizable "only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Id. at 64 (emphasis in original).

Plaintiffs rely on 16 U.S.C. § 1854(c) as the source of the Secretary's purportedly mandatory duty to add the river herring and shad to the MSB FMP. See Pls.' Opp'n at 34 & n.25. The only part of that provision relevant to this case, however, is Section 1854(c)(1)(A), which states that the Secretary "may" develop a "necessary amendment" to an FMP without waiting for action by the Council if, "after a reasonable period of time," the council fails to develop and submit such an amendment to her. 16 U.S.C. § 1854(c)(1)(A); see also Hawaii Longline Ass'n., 281 F. Supp. 2d at 3.

While Section 1854(c)(1)(A) clearly provides that the Secretary herself "may" develop a "necessary amendment," it does

not mandate that she "shall" or "must" do so. By contrast, Section 1852(h) states that each council "shall" prepare fishery management plans and any necessary amendments, and Section 1854(a) provides that the Secretary "shall" review such plans or amendments, "shall" publish them for notice and comment, and "shall" thereafter approve, disapprove, or partially approve them. 16 U.S.C. § 1854(a)(1), (3).

As our Court of Appeals has held, "when a statute 'uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense — the one act being permissive, the other mandatory.'" Sierra Club v. Jackson, 648 F.3d 848, 856 (D.C. Cir. 2011) (citations omitted); see also Lopez v. Davis, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' . . . to impose discretionless obligations[.]").

Therefore, Section 1854(c)(1)(A) permits but does not require the Secretary to develop a necessary amendment in the absence of action by a council. See, e.g., Sea Hawk Seafoods, Inc. v. Locke, 568 F.3d 757, 767 (9th Cir. 2009) ("Because the word 'may' [in the American Fisheries Act] implies discretion, there is no legally required action imposed on [NMFS]") (emphasis in original); Martha's Vineyard/Dukes Cnty. Fishermen's Ass'n v. Locke, 811 F. Supp. 2d 302, 308 n.7 (D.D.C.

2011) (noting that NMFS is "in no way <u>required</u> to promulgate plaintiffs' requested regulations" under several sections of the MSA, including 16 U.S.C. § 1854(c)(1)) (emphasis in original).[13]

Plaintiffs also argue that this Court and others have held that the MSA "plainly gives NMFS the final responsibility for ensuring that any FMP is consistent with the MSA's National Standards, and 'the overall objectives' of the Act," including "Section 1852(h)'s requirement that the Council prepare an FMP or amendment for any stock of fish that 'requires conservation and management[.]'" <u>See</u> Pls.' Opp'n at 24-25; <u>see also</u> <u>Flaherty v. Bryson</u>, 850 F. Supp. 2d 38, 54-66 (D.D.C. 2012).

But each of the cases on which Plaintiffs rely challenged final actions of the Secretary and therefore did not rely on the Secretary's inaction under Section 706(1). Instead, they fell squarely within the provisions of 5 U.S.C. § 706(2), providing for judicial review of affirmative agency actions. <u>See</u> <u>Flaherty</u>, 850 F. Supp. 2d at 51 (considering challenge to final FMP amendment promulgated by NMFS and published in Federal

---

[13] Despite Section 1854(c)(1)(A)'s clear use of the word "may," Plaintiffs argue that it imposes a mandatory obligation and that "Congress used the word 'may'" simply because "there are both mandatory and discretionary provisions under the Act[.]" Plaintiffs do not, however, cite any authority or specific characteristic of the statutory framework that supports this argument.

Register); Guindon, 2014 WL 1274076, at *7-10 (considering challenge to two final rules and one temporary rule promulgated by NMFS, each of which were published in the Federal Register); Oceana, Inc. v. Pritzker, No. 11-1896, 2014 WL 912364, at *3-4 (D.D.C. Mar. 10, 2014) (considering challenge to final FMP amendment promulgated by NMFS and published in Federal Register). Plaintiffs, by contrast, seek to challenge a non-final action of the Mid-Atlantic Council, which was never published for notice and comment or approved by the Secretary. There would, quite simply, be nothing for this Court to review and "set aside" under Section 706(2) in this case.

Plaintiffs also suggest that Defendants failed to comply with their duty under 16 U.S.C. § 1854(e), to identify overfished populations. Under Section 1854(e), the Secretary must "report annually to the Congress and the Councils on the status of fisheries within each Council's geographic area of authority and identify those fisheries that are overfished or are approaching a condition of bring overfished." 16 U.S.C. § 1854(e)(1). The Act defines "overfished" as a "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34).

As in <u>Norton</u>, however, while these provisions collectively require the Secretary to assess and report whether any fisheries are being fished at an unsustainable level, there is no specific statutory requirement that she designate the river herring and shad in the MSB fishery as overfished. The Act leaves it to the agency's sound discretion to apply the definition in Section 1802(34) and determine whether any fisheries are being overfished. <u>See</u> <u>Norton</u>, 542 U.S. at 65 ("[W]hen an agency is compelled by law to act . . . but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be.").

In sum, Section 1854(e) does not impose a "discrete" statutory requirement to identify the river herring and shad as overfished.

Finally, Plaintiffs also cite <u>Massachusetts v. EPA</u>, 549 U.S. 497, 527-28 (2007) and <u>Am. Elec. Power Co. v. Conn.</u>, 131 S. Ct. 2527, 2539 (2011) for the proposition that "[t]he refusal to issue a rule (<u>e.g.</u>, by denying a petition for rulemaking) constitutes a 'denial' [under] 5 U.S.C. § 551(13), and is subject to review." Pls.' Opp'n at 33. While Plaintiffs are correct that an agency's final denial of a rulemaking petition under 5 U.S.C. § 553(e) is final agency action reviewable under the APA, they have not alleged anywhere in their Complaint that

they ever petitioned NMFS for a rulemaking pursuant to 5 U.S.C. § 553(e), much less that NMFS issued a final decision denying such a petition.[14]

For all of the foregoing reasons, Plaintiffs have failed to state a claim under the MSA and the APA in Count 1. Consequently, that claim shall be dismissed.

## B.    Count 2: Violation of NEPA

In Count 2, Plaintiffs allege that Defendants failed to prepare an environmental impact statement and to "take a hard look at associated environmental impacts" in connection with the termination of Amendment 15. See Compl. ¶¶ 103-110.  They claim that this failure violated NEPA, 42 U.S.C. § 4332(2)(C), which requires federal agencies implementing "major Federal actions significantly affecting the quality of the human environment" to examine the environmental effects of such action by preparing an environmental impact statement ("EIS").  42 U.S.C. § 4332(2)(C).

---

[14] In their Opposition brief, Plaintiffs argue that they did, indeed, "petition Defendants for rulemaking, consistent with the unique rulemaking process established in the MSA, through their participation in the development of Amendments 14 and 15 by NMFS and the Mid-Atlantic Council." Pls.' Opp'n at 32-34.  However, even in their Opposition brief, Plaintiffs merely suggest that they participated in the Council's consideration of Amendment 15.  They do not refer to any specific petition under 5 U.S.C. § 553(e), directed to or acted upon by Defendants, as opposed to the Council, who as noted, is not a defendant in this case.

As our Court of Appeals has held, "because NEPA creates no private right of action, challenges to agency compliance with the statute must be brought pursuant to the [APA], which requires 'final agency action for which there is no other adequate remedy in a court[.]'" Karst Envtl. Educ. & Prot., Inc. v. E.P.A., 475 F.3d 1291, 1295 (D.C. Cir. 2007) (citations omitted). "[T]he 'final agency action' required by the APA must also be a 'major federal action' under NEPA." Id. (citation omitted).

Agency decisions that "maintain[] the substantive status quo" do not constitute "major federal actions" under NEPA. See Fund for Animals, Inc. v. Thomas, 127 F.3d 80, 83-84 (D.C. Cir. 1997) (citing Comm. for Auto Responsibility v. Solomon, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) ("The duty to prepare an EIS normally is triggered when there is a proposal to change the status quo.")). Furthermore, NEPA applies only to "major Federal actions," even where, as here, it is alleged that "the environmental consequences of inaction may be greater than the consequences of action[.]" Defenders of Wildlife v. Andrus, 627 F.2d 1238, 1243-44 (D.C. Cir. 1980).

Finally, even where an agency does contemplate taking affirmative action, an EIS is not required until the agency "reaches the critical stage of a decision which will result in

'irreversible and irretrievable commitments of resources' to an action that will affect the environment." Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 49 (D.C. Cir. 1999) (citation omitted).

As discussed at length above, Plaintiffs have not identified any final agency action under the APA. They cite Ramsey v. Kantor, 96 F.3d 434 (9th Cir. 1996) for the proposition that NMFS's inaction can support a claim under NEPA. Pls.' Opp'n at 41-42. But the inaction at issue in Ramsey was that NMFS's failure to disapprove plans prepared by a regional council resulted in the plans at issue attaining the force of law. See Ramsey, 96 F.3d at 445. See also 16 U.S.C. § 1854(a)(3).

In this case, by contrast, NMFS's failure to act did not result in any proposals or plans attaining the force of law. Consequently, an EIS under NEPA is not required. See, e.g., Int'l Ctr. for Tech. Assessment v. Thompson, 421 F. Supp. 2d 1, 9 (D.D.C. 2006) (finding NEPA inapplicable because "[t]he FDA's decision not to regulate GloFish is not an agency action, but rather, an agency inaction" to which "no resources are being committed").

In sum, Plaintiffs have failed to state a claim under NEPA because Defendants have not taken any final agency action that

alters the substantive status quo or constitutes an "irreversible and irretrievable commitment of resources' to an action that will affect the environment." <u>Wyoming Outdoor Council</u>, 165 F.3d at 49.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss shall be **granted**. An Order shall accompany this Memorandum Opinion.

September 30, 2014

Gladys Kessler
United States District Judge

**Copies to**: attorneys on record via ECF